### MASON v. ABEL.
No. 13938.

Court of Civil Appeals of Texas. Dallas.
Oct. 8, 1948.

Rehearing Denied Nov. 19, 1948.

378

Runge, Lane & Savage, of Dallas, for appellant.

Smithdeal & Lefkowitz and Shook & Shook, all of Dallas, for appellee.

BOND, Chief Justice.

Appellant Marshall A. Mason, Sr., instituted this suit against appellee Frank H. Abel for commissions alleged to have been earned by him in securing a purchaser, ready, able and willing to buy a certain designated building owned by appellee, situated in the City of Dallas, known as the Construction Building, located at the southwest corner of Akard and Wood Streets in said City.

The transaction out of which the suit arose is an agreement or written memorandum signed by appellee, listing the property for sale with appellant, a duly registered real estate dealer, at a purchase price of $375,000, in which appellee agreed to allow appellant a commission of $15,000; and an additional sum, should the sale of the property exceed $375,000. The case was tried to a jury and at conclusion of appellant's testimony, the trial court, upon motion, instructed a verdict in favor of appellee; accordingly entered judgment that plaintiff take nothing.

In reviewing the action of the trial court in determining whether it was

proper to instruct a verdict, we must view the evidence in the light most favorable to the losing party, the appellant. Thomas v. Postal Telegraph-Cable Co., Tex.Com.App., 65 S.W.2d 282; and we must indulge against the instruction every inference that may properly be drawn from the evidence. Texas Employers' Ins. Assn. v. Boecker, Tex.Civ.App., 53 S.W.2d 327, error refused. A peremptory instruction is warranted only where there is no testimony of probative force in favor of the losing party; or when the evidence is such that no other verdict can be rendered and the winning party is entitled, as a matter of law, to a judgment. Stevens et al. v. Karr, 119 Tex. 479, 33 S.W.2d 725. Applying these well known principles to the facts revealed here, we are of the opinion that the trial court was not warranted in taking the case from the consideration of the jury and entering judgment on the instructed verdict.

We think it is settled by all authorities in this State and other jurisdictions that in order for a broker to recover a commission for his services on real estate transactions, it is necessary for him to show that his services were the procuring cause of a sale on terms and conditions agreeable to the owner. Then, too, "It is a general doctrine that in order for a broker to be entitled to commissions under a contract stipulating for their payment in the event of his sale of given property upon stated terms, a purchaser must have been produced through his efforts, ready, able and willing to buy the property upon the contract terms; otherwise the contract is not fulfilled upon the broker's part and the commissions are therefore not earned. But the commissions are earned and the broker is' entitled to their payment according to the contract if, while it is in force, he procures a purchaser to whom the owner directly makes a sale upon terms which are satisfactory to himself, though different from those limited to the broker and yielding the owner a less amount than that for which the broker was empowered to sell. This is but a rule of fairness and right. In such a case the owner receives the full benefit of the broker's effort. Through the diligence of the broker a buyer is produced. Having interested a pro-spective buyer the broker is entitled to a fair opportunity of making a sale to him upon the terms authorized. That the owner, pending the broker's negotiation, may, in disregard or repudiation of his obligation to respect the broker's right to conclude the transaction, take the matter into his own hands, avail himself of the broker's effort, close a sale upon satisfactory terms, and yet deny the broker's right of compensation, is a proposition not to be countenanced." Goodwin v. Gunter, 109 Tex. 56, 185 S.W. 295, 296. So, too, to recover in this State, by suit, any commission to which a broker is justly entitled, " * * * the promise or agreement upon which such action shall be brought, or some memorandum thereof, shall be in writing and signed by the party to be charged therewith or by some person by him thereto lawfully authorized." Real Estate Dealers License Act, Art. 6573a, Sec. 22, Vernon's Annotated Civil Statutes.

Summarizing the evidence favorable to the appellant, excluding that of appellee, the record discloses that in June 1945, on information that Mr. Abel, the appellee, had purchased the Construction Building in suit, Mr. Mason solicited and secured the agency to resell it for $375,000, either for cash or on terms and conditions agreeable to the owner. On that basis, Mr. Mason contacted and interested a Mr. L. F. Corrigan as a prospective purchaser who made him an offer for the property of $300,000 and directed the offer be submitted to Mr. Abel for his consideration—which offer was not accepted. Whereupon, Mr. Mason diligently continued his efforts to sell the property to Mr. Corrigan and some nine or ten other prospects, including a Mr. John R. Hinson and Mr. Albert A. Siebler. At that time, Mr. Mason was working under a verbal broker's agreement. On October 25, 1945, Mr. Mason asked Mr. Abel to give him a written memorandum in reference to his agency and commission; evidently realizing, from talking with Mr. Abel, under revealed circumstances, that a written memorandum was necessary to protect his commission in the event of securing an acceptable purchaser for the property. In consequence, Mr. Abel prepared, signed

and delivered to Mr. Mason the following letter of authority:

"October 25, 1945. RE: Sale of Construction Building Akard and Wood Streets Dallas, Texas. Mr. M. A. Mason Dallas, Texas. Dear Sir: This is to confirm our verbal agreement which authorizes you to show the Construction Building for the purpose of sale. The commission involved is $15,000.00, provided the sale of the building is $375,000.00. Should the sale of the building exceed $375,000.00, it is understood that any amount in excess of the $375,000.00 will be divided equally between yourself and myself. This additional compensation does not in any way affect the first $15,000.00 commission. It is understood that the building is now leased by various tenants and the purchase of said building is subject to leases in force. It is understood that purchasers are two mainly, or their associates who may become known in the transaction before closing: Mr. John R. Hinson and Mr. Albert A. Siebler, Irvington Hotel, Dallas, Texas. Terms on the building can be cash or terms as agreed upon. The intention of this letter is to notify you that you have the authority to show the building under these conditions and is not to be construed to mean that the owner is giving an option to you for any length of time. Yours very truly, /s/ Frank H. Abel. Frank H. Abel."

Contemporaneously with the execution and delivery of the above letter, Mr. Abel gave Mr. Mason a copy of a letter which he had previously written to a Mr. Hughes, in which he rendered a six-months statement of the earnings, operating costs and income from the building in excess of $120,-000, which letter Mr. Mason was privileged to show to any prospective purchaser, to encourage the sale of the building. On recepit of the aforesaid letters, Mr. Mason again sought out Mr. Corrigan and exhibited to him both of such letters; whereupon, Mr. Corrigan submitted a written offer which he himself prepared to be submitted to Mr. Abel for his acceptance, accompanying it with a check in the sum of $5,000 as part of the purchase money, evidencing good faith in the premises. The proposal of Mr. Corrigan, following closely the description of the property, recites the consideration of $375,000 to be paid $95,000 cash and the balance in acceptable deferred payments in the sum of $280,000. The submitted proposal was made on real estate Form of the Dallas Real Estate Board, reciting terms and conditions affecting the sale and purchase of the property and the closing of the deal upon acceptance by the seller. The proposal is lengthy, and it will serve no useful purpose here to incorporate it in extenso. Mr. Mason testified that he carried the Corrigan contract and the $5,-000 check over to Mr. Abel on the following Monday morning after its execution and found him out of town; that he called him Saturday night, and again Sunday morning over the 'phone at his home, and said to him " 'I've got some good news' and he said 'What is it?' and I told him that I had sold the property, and he asked 'To whom?' and I told him to a Mr. Corrigan, and he said 'I will be down early Monday morning.' " In the meantime Mr. Corrigan had left Dallas for New York and, on Monday, November 5, about nine o'clock, Mr. Mason went to Mr. Abel's office, gave him the contract and check; and, after looking them over, Mr. Abel said: "I don't see anything wrong with this. Where is Mr. Corrigan?" Mr. Mason said: "He is out of town; he had to go out of town for a few days and he told me to bring the contract over here and leave it with you and that he would trade with you as soon as he got back." Mr. Abel then said: "I don't see any reason why we can't make a deal on this; there might have to be a little adjustment made. We can work it out." Subsequently, on Mr. Corrigan's return from New York, Mr. Mason talked with Mr. Corrigan, who asked him about the outcome of his offer and, after telling him of the conversation had with Mr. Abel, Mr. Corrigan said to Mr. Mason: "It looks like we have made a deal" and "Was there any objection to any of the contract?" After being advised that there was none, Corrigan said: "You tell him I will be back in a few days and as soon as I get back we will close it up." After this conversation with Mr. Corrigan, Mr. Mason went back to Mr. Abel and told him that Mr. Corrigan would be back in a few days and would close the deal, to which Mr. Abel made no objection; only said:

"It looks like he is trying to make me guarantee him $120,000 a year on the building." To which Mr. Mason answered that the contract Corrigan submitted did not make any guarantee; that it only exemplified that it was based on the statement made by Mr. Abel in letter to Mr. Hughes in reference to the building being built up to earn $120,000 on leases from three floors of the building, and that he would buy the building for $375,000. At this juncture, Mr. Abel (referring to the provision in Mr. Corrigan's written offer: "Seller herein agrees to convey with the building, leases calling for a rental income of approximately $120,-000.00 annually, said leases to run for a period averaging approximately four years") said: "Well, if he is going to require me to guarantee $120,000 on the building, I cannot do that." Then Mr. Mason said: "That is not what it means. He didn't intend for the contract to guarantee $120,000; he meant on the terms which are outlined in Mr. Hughes' letter that you gave me, and he says 'He has three floors leased on that basis and I am giving you a contract that I am buying the building for that price and I want to pay him this much cash and if those terms are not satisfactory to Mr. Abel, when you talk with him again, tell him that I will give him such cash or give him more. That I am up here now where I can handle the finances just like I want it.' " On such assurance revealed to Mr. Abel, Mr. Mason told him that he had talked to Mr. Corrigan and he was taking the building on any terms that he (Abel) wanted; that if the terms of his contract were not satisfactory, to tell him to put his terms in writing and have them ready when he got back and they would close the deal. In response to that information, Mr. Abel asked when Mr. Corrigan would return and Mr. Mason answered "He will be back in a few days and will work out a deal." Subsequently, a few days thereafter, Mr. Mason saw Mr. Corrigan and in conversation with him, Corrigan said he was willing to buy the building on terms submitted; Mason so advised Mr. Abel, who said "All right."

Later, on November 11, Mr. Abel, in conversation with Mr. Mason over the telephone, related that he had changed his mind, saying: "I am not going to sell the building; I am just not going to sell it." Then, on November 12, Mr. Mason received the following letter from Mr. Abel:

"Mr. M. A. Mason, Dallas, Texas Dear Mr. Mason: Under date of October 25th, 1945, you received a letter confirming verbal agreement with reference to the projected sale of the Construction Building. Since no contract has been tendered conformable to the terms of the written agreement, and since the parties named in the letter have been disinterested in the acquisition of the property, on the terms named, and because of the lapse of time, this will advise you that I consider all authority terminated under the letter, and that no obligation of any kind to you exists. Very truly yours, /s/ Frank H. Abel Frank H. Abel."

Mr. Corrigan testified by deposition corroborative in the main of the testimony of Mr. Mason as to his part in the transaction; further stated that he was prepared financially to buy the property on the basis of his written offer, and that, being advised the offer was not accepted in writing, nothing signed by Mr. Abel, the contract, as to him, became unenforceable and the negotiation a "closed transaction."

From the above evidence it is clear that the efforts and services of Mr. Mason were the efficient and procuring cause of the negotiation between Mr. Corrigan and Mr. Abel; and, we think, though sharply controverted by that of appellee, who was offered as an interested adverse witness by the appellant, raises issues for the determination of the jury: (1) That appellee verbally accepted the aforesaid offer of Mr. Corrigan; (2) that Mr. Corrigan was ready, able and willing to buy the building on the terms and conditions of his proposal; (3) that appellee arbitrarily refused to carry out the agreement to convey the property in accordance with the accepted agreement between the parties, and (4) that Mr. Abel stopped the negotiation without giving Mr. Mason a reasonable time to effect the sale.

A verbal contract to sell or purchase real estate is not void—but merely voidable—in suits to enforce performance. The Statute of Frauds, Art. 3995, in suits upon contract for sale of real estate, merely

presents the operation of the statute inhering in consequence of setting up the statute to avoid performance. Manifestly, the interpretation and effect to be given to Sec. 22 of the Real Estate Dealers License Act, supra, should be limited by the court in its construction to mean only what it says. It is a virtual extension or enlargement of the Statute of Frauds. There can be no difference in principle between action brought under subdv. 22 for commissions where a person has been employed and rendered services fully performed, in bringing the purchaser and seller of real estate together and the parties to the sale have reached an agreement, and where contracts for conveyances of real estate are made without a written agreement, but where there has been performance of a verbal contract. The contract as involved here between Mr. Abel and Mr. Corrigan, was a valid agreement between the parties and subject to judicial enforcement, unless, forsooth, appellee should elect to rely on its voidable character under the Statute of Frauds. The applicaiton of the statute is purely an optional defense to the enforcement of such contracts in suit.

 In Roberts & Corley v. McFaddin, Weiss & Kyle, 32 Tex.Civ.App. 47, 74 S.W. 105, 110, writ of error refused, it is said: "If a person contracts to convey a piece of land on a certain day for a certain price, and between the date of the contract and the day of performance he sells to another, thus putting it out of his power to convey, he is liable to the vendee for the loss of his bargain." An optional defense to a suit for specific performance of a contract for the sale of real estate, or the refusal of the seller, or owner, for any cause to perform a valid agreement to sell, is no defense in suit for broker's commission; and, where the broker and the owner, as in the case at bar, in writings conforming to Sec. 22, Real Estate Dealers License Act, supra, enter into a contract for the payment of broker's commission for the sale of real estate, and the broker secures a purchaser, ready, able and willing to buy the real estate upon terms acceptable to the owner, the broker is entitled to his commissions. Any optional defense available, in law or equity, to the owner as against the purchaser is not available defense to a suit by the broker against the owner. The duty of the broker to the owner is to secure a purchaser and be the efficient and procuring cause for enforceable contract by the owner against the purchaser. In the case here, Mr. Mason procured the purchaser and obtained a written, enforceable contract by the owner against the purchaser, which Mr. Abel could have enforced against Mr. Corrigan. In the absence of an acceptable written contract, indeed, Mr. Corrigan could not have enforced the performance, but surely enforceable by Mr. Abel. Hence Mr. Abel's refusal to perform is not available against Mr. Mason's contract for commission, whose services as a broker have been fully performed.

 Furthermore, if it could be said that Mr. Mason had not effected a contract of sale with Mr. Corrigan acceptable to Mr. Abel and that Mr. Abel had not agreed to the terms and conditions of Mr. Corrigan's proposal, it is in evidence that the negotiations had proceeded to the point where no valid objections or exceptions were asserted from either party; and that the transaction had proceeded to the extent where Mr. Mason's efforts and services were no longer needed to close the deal— he had performed his broker's duty. Such circumstances, in absence of some excuse justifying Mr. Abel's calling the deal off at the threshold of Mr. Mason's success in perfecting an acceptable contract between the parties, presents questions for the jury as to whether or not Mr. Abel arbitrarily withdrew his property entirely from the market; and, whether or not Mr. Mason was entitled to a reasonable time for the purchaser and owner to adjust their differences.

 In view of another trial, and the liberality of courts in admitting testimony given by witnesses in response to questions, as being unresponsive, we give brief consideration to appellant's points of error complaining of the action of the court in reference to Mr. Corrigan's testimony in depositions as not being responsive to the questions asked. In response to questions to Mr. Corrigan: (1) "Question: Were you

ready to pay cash up to the purchase price? Answer: Subject to knowing what to do; it was a matter for negotiation." We think, in the light of Mr. Mason's testimony as herein related, and a reasonable inference of the affirmative answer, the objection should have been overruled; (2) "Question: Do I understand now that you would have paid the price of $375,000 cash without any condition of any kind? Answer: If he had given me a long enough time, I believe I could." (3) "Question: * * * Did you authorize Mr. Mason to say that you would pay $375,000 cash for this property without any other condition except the condition on title at that time? Answer: At that time, I was prepared to take it because I know where I could finance it." We think the court erred in excluding the depositions, and on another trial such may be admitted.

The judgment of the trial court is reversed; cause remanded for another trial.